IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

THE UNITED STATES OF AMERICA    §
and THE STATE OF TEXAS, ex rel. §
AMY COOK-RESKA,                 §
                                §
            Relator,            §
                                §
v.                              §
                                §
COMMUNITY HEALTH SYSTEMS, INC.; §    CIVIL ACTION NO. H-09-1565
LAREDO TEXAS HOSPITAL COMPANY,  §
L.P. d/b/a LAREDO MEDICAL       §
CENTER; WEBB HOSPITAL CORP.;    §
CHS/COMMUNITY HEALTH SYSTEMS,   §
INC.; and COMMUNITY HEALTH      §
SYSTEMS PROFESSIONAL SERVICES   §
CORPORATION,                    §
                                §
            Defendants.         §

## MEMORANDUM OPINION AND ORDER

     Pending before the court is Relator's Amended Motion for Award of Attorneys' Fees, Costs, and Expenses, Related Solely to Her Non-ED Claims Against Defendants, Pursuant to 31 U.S.C. § 3730(d)(1) (Docket Entry No. 109), and Relator's Motion to Transfer Remaining Portion of Realtor's Case to the Middle District of Tennessee ("Relator's Motion to Transfer") (Docket Entry No. 110).  For the reasons stated below, Relator's motion for attorneys' fees will be granted in part and denied in part, and Relator's motion to transfer will be denied.

## I.  Factual and Procedural Background

     Relator initiated this action in May of 2009 under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., and the Texas

Medicaid Fraud Prevention Act ("TMFPA"), Texas Human Resources Code § 36.001, et seq., against Community Health Systems Professional Services Corporation ("CHSPSC"); Laredo Texas Hospital Company, L.P. d/b/a Laredo Medical Center ("LMC"); Webb Hospital Corporation ("WHC"); Community Health Systems, Inc. ("CHSI"); and CHS/Community Health Systems, Inc. ("CHS/CHSI") based on allegations that LMC billed government programs for medically unnecessary inpatient procedures and engaged in improper financial relationships.[1] Based on Relator's allegations, disclosures, and interviews with an Assistant United States Attorney ("AUSA") for the Southern District of Texas, Relator began helping the United States investigate the defendants.[2] In early 2011 the United States informed Relator that there were three similar FCA suits filed against CHS in other federal courts.[3] Based on similarities in the allegations made in these four cases, the United States began a nationwide investigation focused on allegations of false claims in Emergency

---

[1] See Settlement Agreement, Exhibit A to the United States' Notice of Settlement, Docket Entry No. 64, p. 5, Recitals, ¶ D.2. See also False Claims Act Complaint, Docket Entry No. 2; First Amended False Claims Act Complaint, Docket Entry No. 24; Second Amended False Claims Act Complaint, Docket Entry No. 38.

[2] Relator's Amended Motion for Award of Attorney's Fees, Costs, and Expenses, Related Solely to Her Non-ED Claims Against Defendants, Pursuant to 31 U.S.C. § 3739(d)(1) ("Relator's Amended Motion for Fees, Costs, and Expenses"), Docket Entry No. 109, p. 4 (citing Declaration of Patrick J. O'Connell ("O'Connell Declaration"), Exhibit 2, Docket Entry No. 109-3, ¶ 20).

[3] Id. at 5 (citing Declaration of Jan Soifer ("Soifer Declaration"), Exhibit 3, Docket Entry No. 109-4, ¶ 30).

Department admissions ("ED Claims"), and asked these four relators
to assist with the investigation.  In April of 2011 the relators in
these four cases agreed to work together and to share any proceeds
that might result.[4]  This action is now one of seven actions filed
between January of 2009 and May of 2011 in five different states by
various relators against hospitals affiliated with CHSI under the
FCA and similar state statutes.[5]

---

[4]Id.

[5]See Defendants' Motion to Sever and Transfer Relator's Claim
for Attorneys' Fees and Costs Related to Allegations of Improper
Emergency Department Admissions ("Defendants' Motion to Sever and
Transfer"), Docket Entry No. 76, p. 6 (listing the seven actions as
follows:

- *United States ex rel. Reuille v. Cmty. Health Sys.
  Prof'l Servs., Corp., et al.,* No. 1:09-cv-00007
  (N.D. Ind. Jan. 7, 2009) ("*Reuille*");

- *United States et al. ex rel. Cook-Reska v. Cmty.
  Health Sys., Inc., et al.,* No. 4:09-cv-01565 (S.D.
  Tex. May 22, 2009), *complaint amended on* Dec. 21,
  2010 ("Relator" or "*Cook-Reska*");

- *United States ex. rel. Plantz v. Health Mgmt.
  Assocs., Inc., et al.,* No. 1:10-cv-00959 (N.D. Ill.
  Feb. 11, 2010) ("*Plantz*");

- *United States ex rel. Bryant v. Cmty. Health Sys.,
  Inc., et al.,* 4:10-cv-02695 (S.D. Tex. July 29,
  2010) ("*Bryant*");

- *United States et al. ex. rel. Carnithan v. Cmty.
  Health Sys., Inc., et al.,* No. 11-CV-312-WDS/DGW
  (S.D. Ill. Apr. 14, 2011)("*Carnithan*");

- *United States et al. ex rel. Mason v. Cmty. Health
  Sys., Inc.,* No. 3:12-cv-00817 (W.D.N.C. Apr. 18,
  2011), *complaint amended on* Apr. 12, 2012 & Jan. 9,
  2013 ("*Mason*"); and

(continued...)

On August 4, 2014, the Government filed the United States'
Notice of Settlement (Docket Entry No. 64) stating that a
Settlement Agreement between the parties had been fully executed.
Exhibit A attached thereto establishes that CHSI and its affiliates
entered into a global Settlement Agreement with the United States
and the Relators in the seven related actions that resolved the FCA
claims asserted in all seven actions based on allegations (1) that
CHSI-affiliated hospitals had improperly admitted patients who
presented themselves to the hospitals' emergency departments, i.e.,
the national ED claim; and (2) that LMC had engaged in improper
billing and referral practices, i.e., the non-ED claims.[6]  CHSI and
its affiliates agreed to settle the national ED claim for
$88,257,500 and the non-ED LMC improper billing and referral claims
for $9,000,000.[7]  The Settlement Agreement does not provide for any
monetary award to the Relators.  Instead, the Settlement Agreement
states that "Relators and their counsel claim entitlement under 31
U.S.C. § 3730(d) to a share of the proceeds of this Settlement
Agreement and to Relators' reasonable expenses, attorneys' fees and

---

[5](...continued)
- *United States ex rel. Serv. Employees Int'l Union,
  et al. v. Comm. Health Sys., Inc., et al.,*
  No. 3:11-cv-00442 (M.D. Tenn. May 10, 2011)
  ("*Doghramji*")).

[6]United States' Notice of Settlement, Docket Entry No. 64.

[7]Settlement Agreement, Exhibit A to United States' Notice of
Settlement, Docket Entry No. 64, pp. 4-5, Recitals, ¶¶ D.1-D.2.

costs."[8]   The Settlement Agreement expressly reserves the issue of

which Relator (if any) is entitled to share in the Government's

recovery.[9]   The Settlement Agreement also reserves the issue of

which Relator (if any) is entitled to recover attorneys' fees under

31 U.S.C. § 3730(d).[10]   Finally, the Settlement Agreement provides

that

> [t]he exclusive jurisdiction and venue for any dispute
> relating to this Agreement is the United States District
> Court for the Middle District of Tennessee, Nashville
> Division, except that this choice-of-forum clause shall
> not govern any disputes between CHS and any particular
> relator arising from that relator's request for
> attorneys' fees pursuant to 31 U.S.C. § 3730(d) or any
> claims Relators have under 31 U.S.C. § 3730(h).[11]

On August 19, 2014, the United States and Relator submitted a

Joint Notice of Dismissal with a proposed Order attached (Docket

Entry No. 65).   The court has not yet signed the order because of

the pending dispute over attorneys' fees.

On August 22, 2014, Relator entered into a Settlement

Agreement with the United States pursuant to which:

> 1.   The United States agrees that Relator shall be
> awarded $2,141,184.04 plus interest on that amount at a
> rate of 2.25% from May 11, 2014, representing a share of
> that portion of the $97,257,500 settlement amount agreed
> upon by CHS and the United States attributable to
> Relator's Complaint, including the allegations of
> improper inpatient procedures, Stark law violations, and

---

[8]Id. at 5, Recitals, ¶ G.

[9]Id. at 15, Terms and Conditions, § 15(c)(3).

[10]Id. ¶ 15(c)(1).

[11]Id. at 15-16, Terms and Conditions, ¶ 18.

-5-

improper admissions through the Emergency Department at
Laredo Medical Center.  The United States will make this
payment within a reasonable time after the United States'
receipt of the $97,257,500 from CHS.  The obligation to
make this payment to the Relator is expressly conditioned
on the receipt by the United States of the payment by CHS
under the CHS Settlement Agreement.  Should CHS fail to
make  any  payment  required  by  that  Agreement,  the
United States shall have no obligation to make a payment
to the Relator.

2.     Relator  agrees  that  this  settlement  is  fair,
adequate, and reasonable under all circumstances, and
will not challenge the Settlement Agreement pursuant to
31 U.S.C. § 3730(c)(2)(B), and expressly waives the
opportunity for a hearing on any such objection, pursuant
to 31 U.S.C. § 3730(c)(2)(B).

3.     Conditioned upon Relator's receipt of the payment
described in Paragraph 1, Relator . . . fully and finally
release[s] . . . the United States . . . from any claims
arising from the filing of the Civil Action or under 31
U.S.C. § 3730, and from any claims to a share of the
proceeds of this Agreement and/or the Civil Action.

4.     Specifically excluded and reserved from those claims
released under Paragraph 3 above is any dispute, claim,
or defense which may arise between the Relator and CHS
regarding attorneys' fees or claims of the Relator under
31 U.S.C. § 3730(d)(1).[12]

On September 5, 2014, Relator filed her original motion for

attorneys' fees, expenses, and costs (Docket Entry No. 73), seeking

$3,464,572.50 in attorneys' fees for her counsel's work on the

national ED and LMC claims.  Defendants opposed Relator's original

motion for attorneys' fees, expenses, and costs, arguing that

(a) although Relator is entitled to recover fees for the
Laredo claim, the False Claims Act's first-to-file bar
precludes Relator from recovering attorneys' fees for the

_____

[12]Settlement Agreement, Exhibit C to Defendants' Memorandum in
Opposition to Relator's Motion for Attorneys' Fees, Costs, and
Expenses, Docket Entry No. 83-4, pp. 2-3.

national ED claim; (b) the billing records submitted by
Relator's counsel were deficient because they failed to
segregate the national ED work from the Laredo work; and
(c) to the extent the Laredo claim hours could be
isolated, significant discounts were required to the
hourly rates and number of hours claimed by Relator's
counsel.[13]

Defendants also moved to sever and transfer to the United States
District Court for the Middle District of Tennessee the portion of
Relator's original motion for attorneys' fees, expenses, and costs
related to the national ED claim.[14]   Asserting that relators from
all seven qui tam actions from around the country had contacted
them seeking attorneys' fees and expenses based on the national ED
claim, defendants argued that judicial efficiency and the interests
of justice would be advanced by consolidating all of the fee
requests based on the national ED claim, so that the issue of fee
entitlement under the first-to-file bar could be resolved in a
single proceeding before one judge with all of the relators
participating.   Relator opposed the motion to sever and transfer
arguing that segregating the Laredo work from the national ED work
was an "impossible task," and that "documents were not produced by
Defendants in such a way as to segregate documents that prove CHS

---

[13]Defendants' Memorandum in Opposition to Relator's Amended
Motion for Attorneys' Fees, Costs, and Expenses (Defendants'
Memorandum in Opposition"), Docket Entry No. 118, p. 5 (citing
Defendants' Memorandum in Opposition to Relator's Motion for
Attorneys' Fees, Costs, and Expenses, Docket Entry No. 83).

[14]See Defendants' Motion to Sever and Transfer, Docket Entry
No. 76.

management was directing ED fraud at LMC only from those that prove that CHS management was directing ED fraud at other hospitals."[15]

On October 30, 2014, the court entered a Memorandum Opinion and Order granting Defendants' Motion to Sever and Transfer Realtor's Claim for Attorneys' Fees and Costs Related to Allegations of Improper Emergency Department Admissions (Docket Entry No. 106). The October 30, 2014, Memorandum Opinion and Order denied without prejudice Relator's original motion for attorneys' fees, costs, and expenses, and ordered Relator to file an amended motion for an award of attorneys' fees, costs, and expenses related solely to the non-ED claims, i.e., "claims based on allegations that Laredo Medical Center billed government programs for medically unnecessary inpatient procedures and engaged in improper financial relationships."[16]  On December 8, 2014, Relator filed the two pending motions:  (1) the Relator's Amended Motion for Fees, Costs, and Expenses (Docket Entry No. 109); and (2) Relator's Motion to Transfer (Docket Entry No. 110).

## II.  Relator's Motion to Transfer

Defendants do not dispute that Relator is entitled to attorneys' fees for work performed on claims arising from

---

[15]Relator's Response to Defendants' Motion to Sever and Transfer Relator's Claim for Attorneys' Fees and Costs Related to Allegations of Improper Emergency Department Admissions ("Relator's Response to Defendants' Motion to Sever"), Docket Entry No. 95, p. 13.

[16]Memorandum Opinion and Order, Docket Entry No. 106, p. 21.

-8-

allegations that LMC engaged in improper billing and referral practices for which the United States is to receive $9,000,000 in damages pursuant to the Settlement Agreement.[17]  Relator, however, asserts that since the date of the October 30, 2014, Memorandum Opinion and

> Order, Relator's counsel have reviewed each of their more than 2200 billing entries for the six-year period of October 27, 2008 through mid-October 2014, in an attempt to distinguish between the work done solely on claims involving unnecessary inpatient procedures and improper financial relationships at Laredo Medical Center from the work done on claims involving Emergency Department Admissions at Laredo Medical Center and/or other hospitals owned by Defendants ("ED Claims").  In connection with this review, Relator's counsel reviewed Jan Soifer's 1026 pages of contemporaneous notes and over 7500 saved emails in an attempt to comply with the Court's order [to] file an amended motion which only included time and expenses solely applicable to Non-ED claims.  In so doing, it has become clear to Realtor's counsel that the task of separating time entries based on the claims is not feasible as the Court likely intended the division because a large portion of their work was for the benefit of all of Relator's claims and/or on overlapping aspects of Relator's case, and is not divisible fairly between these claims.  For example, when Relator's counsel was preparing her disclosure to the government required under the FCA, and when she was preparing her complaint, the work was on all claims. Similarly, many of the lengthy communications with the government, research on various legal issues, and communications between Relator and her counsel dealing with status and strategy, dealt with all of her claims. Thus, it has become clear that the time entries cannot be separated cleanly between the work on ED claims and the work on non-ED claims, as a large portion of the work done by Relator's counsel is on multiple aspects of the case, and is inextricably intertwined.[18]

---

[17]Settlement Agreement, Exhibit A to the United States' Notice of Settlement, Docket Entry No. 64, pp. 4-5, Recitals, ¶¶ D.1-D.2.

[18]Relator's Motion to Transfer, Docket Entry No. 110, p. 2.

Relator explains that

> [w]ith significant difficulty, counsel for Relator have
> been able to divide the billing entries into three
> categories: (1) work on Relator's claims that Defendants
> billed for Non-ED Claims; (2) work on Relator's claims
> that Defendants billed for ED Claims; and (3) work on all
> of Relator's claims (1) and (2). The problem is that the
> third category is very large, and both courts will be
> required to consider the time in that category. As a
> result, the severance will not conserve judicial
> resources or avoid the risk of inconsistent decisions, as
> this Court had contemplated. Moreover, both Courts will
> be required to reach decisions about the appropriate
> hourly rates, and whether and how much to discount the
> time entries for the alleged defects Defendants alleged,
> which could risk additional inconsistencies.[19]

Asserting that "Relator offers no legitimate reason why the
Middle District of Tennessee, rather than this Court, should
determine what constitutes a reasonable attorneys' fee award for
the Laredo claim,"[20] defendants argue that Relator's motion to
transfer should be denied because this court is best suited to
determine local hourly rates for attorneys in this district and the
reasonable number of hours expended working on allegations of fraud
for claims arising in this district.[21]

Relator has failed to identify a legal basis for her motion to
transfer. Such motions are usually made pursuant to 28 U.S.C.
¶ 1404(a), which provides: "For the convenience of parties and
witnesses, in the interest of justice, a district court may

---

[19]Id. at 2-3.

[20]Defendants' Opposition to Relator's Motion to Transfer the
Amended Fee Petition, Docket Entry No. 115, pp. 1-2.

[21]Id. at 2. See also id. at 2-5.

transfer any civil action to any other district or division where
it might have been brought or to any district or division to which
all parties have consented." 28 U.S.C. § 1404(a). "A motion to
transfer venue is addressed to the discretion of the trial court
and will not be reversed on appeal absent an abuse of discretion."
Peteet v. Dow Chemical Co., 868 F.2d 1428, 1436 (5th Cir. 1989).
The party seeking transfer bears the burden of demonstrating that
transfer is warranted. Mohamed v. Mazda Motor Corp., 90 F. Supp. 2d
757, 768 (E.D. Tex. 2000).

Relator argues that the court should transfer to the Middle
District of Tennessee her petition for attorneys' fees, costs, and
expenses arising from settlement of the LMC claims because she is
unable to segregate fees, costs, and expenses incurred on these
claims from those incurred on the national ED claims. Relator has
not cited and the court has not found any case in which a motion to
transfer was granted based on similar facts. Instead, citing
Six L's Packing Co., Inc. v. Beale, No. 3:10-CV-01132, 2012
WL 928897, at *2 (M.D. Tenn. March 19, 2012), Relator argues that

the severance will not conserve judicial resources or
avoid the risk of inconsistent decisions, as this Court
had contemplated . . . [because] both Courts will be
required to reach decisions about the appropriate hourly
rates, and whether and how much to discount the time
entries for the alleged defects Defendants alleged, which
could risk additional inconsistencies.[22]

Relator's reliance on Six L's Packing Co., 2012 WL 928897, at
*2, is misplaced because the court in that case was considering a

_____

[22]Relator's Motion to Transfer, Docket Entry No. 110, p. 3.

-11-

motion to sever, not a motion to transfer. The motion to sever filed in this case was resolved in the October 30, 2014, Memorandum Opinion and Order (Docket Entry No. 106). Apart from Relator's inability to segregate attorneys' fees, costs, and expenses between the two sets of settled claims, i.e., the national ED claims and claims that LMC billed government programs for medically unnecessary inpatient procedures and engaged in improper financial relationships, Relator has not presented any reasons for the court to reconsider the rulings made in the October 30, 2014, Memorandum Opinion and Order. Moreover, in the response in opposition that Relator filed to defendants' motion to sever and transfer, Relator expressly asserted that "this Court cannot transfer adjudication of the fees Relator is due as a result of her successful non-ED claims."[23]

Nor has Relator addressed the appropriate private and public interest factors related to the convenience of the parties and the interest of justice that courts consider when addressing motions to transfer. See In re Volkswagen of America, Inc. ("Volkswagen II"), 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (identifying private interest factors as: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of unwilling witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make

---

[23]Relator's Response to Defendants' Motion to Sever, Docket Entry No. 95, p. 2.

trial of a case easy, expeditious, and inexpensive; and public interest factors as: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law). Since Relator has acknowledged that she "is the *only* relator asserting the[] non-ED claims against LMC,"[24] consideration of the private and public interest factors related to the convenience of the parties and the interest of justice leads the court to conclude that there is no basis for transferring Relator's amended motion for attorneys' fees, expenses, and costs arising from the non-ED claims against LMC to the Middle District of Tennessee.   Accordingly, Relator's motion to transfer will be denied.

### III.   Relator's Amended Motion for Attorneys' Fees and Expenses

Asserting that the United States awarded her "a relator's share of the settlement for the[] Non-ED claims,"[25] and citing 31 U.S.C. § 3730(d), Relator seeks to recover reasonable attorneys' fees, expenses, and costs incurred pursuing non-ED claims against LMC "in the amount of $1,979,525 as well as expenses and costs in

---

[24]Id. at 14.

[25]Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, p. 1.

the amount of $48,494.49,"[26] for a total of $2,028,019.49, plus fees incurred after the filing of this Amended Motion.[27]    Relator explains that

> [u]sing the lodestar calculation method, [she] requests
> $1,979,525 in attorneys' fees and $48,494.49 in costs and
> expenses for the work performed for the successful
> recovery of $9 million for Relator's Non-ED claims
> against Defendants and the litigation over recovery of
> these fees and expenses.  The fees requested include fees
> for time clearly expended solely on work on the Non-ED
> claims as well as time spent on all aspects of her case,
> but which was not limited solely to work on the Non-ED
> claims, such as work in drafting the disclosure
> statements and complaints and time investigating and
> developing the case as a whole, as well as for work on
> this Amended Motion and the earlier fee litigation.
> Relator is entitled to reimbursement for the entirety of
> such fees under Fifth Circuit and U.S. Supreme Court law.
> Finally, Relator does not request the Court [to] adjust
> the lodestar under the *Johnson* factors, but even if the
> Court were to apply these factors, they support no less
> than an award of the entire lodestar amount.[28]

Defendants argue that "[f]undamental problems with Relator's Amended Petition require a substantial reduction to that amount."[29] Defendants argue that Relator's fee request is unreasonable because:  (1) more than 20% of the total fees requested are for "fees-on-fees" litigation; (2) the amended motion seeks reimbursement for 2,144 hours that relate to both the national ED claim and

---

[26]Id.   Relator's brief misstates the total amount sought as $2,028,019.10.

[27]Id.

[28]Id. at 3-4 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).

[29]Defendants' Memorandum in Opposition, Docket Entry No. 118, p. 1.

the LMC claims for which the court ordered Relator to submit an amended motion; (3) the hours attributed to the LMC claims are excessive; and (4) the claimed hourly rates are too high.[30] Defendants argue that the court "should award attorneys' fees to Realtor of $236,896.71, plus $4,849.45 in costs and expenses, for the [non-ED] claim[s against LMC]."[31]

> Relator replies that her

> counsel made a good-faith attempt to segregate fees incurred for Non-ED Claims from those incurred for ED Claims. After spending 130 hours on this project (none of which was included in the fees sought), counsel was able to separate out $528,087.50 in fees exclusively incurred for Non-ED Claims and $1,544,662.50 in fees exclusively incurred for ED Claims. . . But a significant portion of counsel's time, totaling $1,451,437.50, was spent working on the intertwined claims, not exclusively on ED or Non-ED Claims, but instead working on drafting the complaint and other similar projects, which counsel necessar[il]y classified in the "Both" category.[32]

Citing <u>United States ex rel. Longhi v. Lithium Power Technologies, Inc.</u>, 575 F.3d 458 (5th Cir. 2009), Relator argues that she is entitled to recover "those fees described under the 'Both' category based on the common core of facts between the ED and Non-ED Claims."[33]   Relator argues

---

[30]<u>Id.</u> at 1-4.

[31]<u>Id.</u> at 4.

[32]Relator's Reply in Support of Her Amended Motion for Award of Attorneys' Fees, Costs, and Expenses ("Relator's Reply"), Docket Entry No. 120, p. 5 (citing Soifer Declaration, Docket Entry No. 109-4, ¶¶ 14-19).

[33]<u>Id.</u>

> [i]n the alternative, if the Court determines that it can
> or should divide an award for these "Both" fees between
> the ED and Non-ED Claims, Relator would suggest that the
> simple way to do that is to split the "Both" fees in
> half, awarding half of the "Both" fees under the instant
> Amended Motion and transferring the other half of the
> fees to Nashville for adjudication. Defendants suggested
> that the Court should split the fees in the "Both"
> category based on the relative size of the recoveries
> under the two types of claims. Defendants' Opp. at 13.
> There is neither a reasonable basis nor support in the
> case law for Defendants' position.[34]

In <u>Longhi</u> the Fifth Circuit recognized that when a plaintiff's
claims for relief involve a common core of facts or are based on
related legal theories, much of counsel's time will be devoted to
the litigation as a whole, making it difficult to divide the hours
expended on a claim-by-claim basis.   <u>Longhi</u>, 575 F.3d at 475-76
(citing <u>Hensley v. Eckerhart</u>, 103 S. Ct. 1933, 1940 (1983).

## A.   Applicable Law

Under the FCA if the United States proceeds with an action
brought by a relator on behalf of the United States, that relator
"shall . . . receive at least 15 percent but not more than 25
percent of the proceeds of the action or settlement of the claim,
depending upon the extent to which the person substantially
contributed to the prosecution of the action."   31 U.S.C.
§ 3730(d)(1).   The FCA also provides that a realtor in such an
action is entitled to receive from the defendant "an amount for
reasonable expenses which the court finds to have been necessarily

---

[34]<u>Id.</u>

incurred, plus reasonable attorneys' fees and costs." Id.  The United States pursued Relator's non-ED claim to a successful settlement with defendants.  The United States attributed $1.8 million of the $2,141,184.04 million award to Relator for her non-ED claims, and $341,184.00 for that portion of the national ED claim related to LMC.[35]  Defendants do not dispute Relator's entitlement to attorneys' fees, expenses, and costs related to the non-ED claims against LMC.  At issue is the amount of attorneys' fees, expenses, and costs to which Relator is entitled for the non-ED claims at LMC.[36]

Relator and defendants all ask the court to apply the lodestar method in determining the amount of attorneys' fees Relator should be awarded.[37]  While neither side has cited the court to any binding

---

[35]See Declaration of Michael Waldman in Support of Defendants' Motion to Sever and Transfer Relator's Claim for Attorneys' Fees and Costs Related to Allegations of Improper Emergency Department Admissions, Exhibit B, Docket Entry 76-2, ¶ 4(b) ("Ms. Cook-Reska, Relator in this action, will receive a relator's share of $2,141,184.04 (exclusive of interest) for the Laredo claim and for the small portion of the national ED claim that relates to Laredo. See Ex. D, ¶¶ 6(a)-(b).  As explained by the DOJ attorneys, approximately $1.8 million of that $2.14 million relator's share was attributable to the Laredo claim (or 20% of the approximately $9 million Laredo claim settlement) and approximately $341,000 was for the ED claim at Laredo (or roughly 20% of the $1.7 million in ED damages at Laredo).").

[36]See Memorandum Opinion and Order, Docket Entry No. 106.

[37]See Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, p. 8 ("Courts have used the 'lodestar method' to calculate attorneys' fees in qui tam cases."); Defendants' Memorandum in Opposition, Docket Entry No. 118, p. 24 ("Defendants do not dispute that the 'lodestar method' is the appropriate method for calculating reasonable attorneys' fees in the Fifth Circuit.").

Fifth Circuit authority holding that the lodestar method should be used in an FCA case, other Circuit Courts of Appeals have approved use of this method in such cases. See United States ex. rel. Vuyyuru v. Jadhav, 555 F.3d 337, 356-57 (4th Cir.), cert. denied, 130 S. Ct. 229 (2009); Gonter v. Hunt Valve Co., Inc., 510 F.3d 610, 616 (6th Cir. 2007) (citing Hensley, 103 S. Ct. at 1939-40). Moreover, the Fifth Circuit uses the lodestar method for calculating reasonable attorney fees in other types of cases. See In re High Sulfur Content Gasoline Products Liability Litigation, 517 F.3d 220, 228 (5th Cir. 2008) (citing Strong v. BellSouth Telecommunications, Inc., 137 F.3d 844, 850 (5th Cir. 1998)).

"The lodestar is calculated by multiplying the number of hours an attorney reasonably spent on the case by an appropriate hourly rate, which is the market rate in the community for this work." Black v. SettlePou, P.C., 732 F.3d 492, 502 (5th Cir. 2013). "There is a strong presumption of the reasonableness of the lodestar amount." Id. See also Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1673 (2010) (recognizing that the lodestar method yields a fee that is presumptively sufficient to achieve the objective of providing a reasonable fee, and that this presumption is a "strong one"). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 103 S. Ct. at 1941.

Compensable hours, reasonably spent, are determined from the attorney's time records. <u>Hensley</u>, 103 S. Ct. at 1933. The Supreme Court has stated that "the applicant should exercise 'billing judgment' with respect to hours worked . . . and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." <u>Id.</u>

> Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant. The proper remedy for omitting evidence of billing judgment does not include a denial of fees, but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment.

<u>Saizan v. Delta Concrete Products Company, Inc.</u>, 448 F.3d 795, 799 (5th Cir. 2006) (citing <u>Hensley</u>, 103 S. Ct. at 1941). Courts usually require the applicant to provide contemporaneous time or billing records or other documentation that the court must examine to discern which hours are compensable and which are not. <u>Louisiana Power & Light Co. v. Kellstrom</u>, 50 F.3d 319, 324 (5th Cir.), <u>cert denied</u>, 116 S. Ct. 173 (1995).

> T]he documentation must be sufficient for the court to verify that the applicant has met its burden. . . [A] district court may reduce the number of hours awarded if the documentation is *vague* or incomplete. . . Failing to provide contemporaneous billing statements does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours.

<u>Id.</u> at 324-25.

Attorneys' fees must be calculated at the prevailing market rates in the relevant community for similar services by attorneys of reasonably comparable skills, experience, and reputation. <u>See</u> <u>Blum</u>

v. Stenson, 104 S. Ct. 1541, 1547 (1984); Powell v. C.I.R., 891 F.2d 1167, 1173 (5th Cir. 1990). The hourly rate must be "adequate to attract competent counsel," but the "measure is not the rates which lions at the bar may command." Leroy v. City of Houston, 906 F.2d 1068, 1079 (5th Cir. 1990). The applicant bears the burden of producing satisfactory evidence that the requested rate is aligned with prevailing market rates. See NAACP v. City of Evergreen, 812 F.2d 1332, 1338 (11th Cir. 1987). Satisfactory evidence of the reasonableness of the rate necessarily includes an affidavit of the attorney performing the work and information of rates actually billed and paid in similar lawsuits. Blum, 465 U.S. at 896 n.11. However, mere testimony that a given fee is reasonable is not satisfactory evidence of a market rate. See Hensley, 461 U.S. at 439 n.15. Rates may be adduced through direct or opinion evidence as to what local attorneys charge under similar circumstances. The weight to be given to the opinion evidence is affected by the detail contained in the testimony on matters such as similarity of skill, reputation, experience; similarity of case and client; and breadth of the sample of which the expert has knowledge. Norman v. Housing Auth. of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988). See also White v. Imperial Adjustment Corp., No. 99-03804, 2005 WL 1578810, at *8 (E.D. La. June 28, 2005) (recognizing that attorneys customarily charge their highest rates only for trial work, and lower rates should be charged for routine work requiring less extraordinary skill and experience). The court may exercise its own

-20-

expertise and judgment in making an independent valuation of appropriate attorney's fees. <u>Davis v. Bd. of Sch. Commissioners of Mobil County</u>, 526 F.2d 865, 868 (5th Cir. 1976).

After calculating the lodestar, a district court may enhance or decrease the amount of attorney's fees based on the relative weights of the twelve factors set forth in <u>Johnson</u>, 488 F.2d at 717-19. <u>See</u> <u>Saizan</u>, 448 F.3d at 800. The <u>Johnson</u> factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues in the case; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>Johnson</u>, 488 F.2d at 717-19. When a district court awards attorneys' fees, it must explain how the <u>Johnson</u> factors affect its award. <u>See</u> <u>In re High Sulfur Content Gasoline Products</u>, 517 F.3d at 228. The Fifth Circuit has instructed that "[t]he lodestar may not be adjusted to a <u>Johnson</u> factor that was already taken into account during the initial calculation of the lodestar." <u>Black</u>, 732 F.3d at 502. <u>See also</u> <u>Saizan</u>, 448 F.3d at 800.

**B.   Lodestar Analysis**

Relator seeks an award of attorneys' fees billed by three law firms:   Baron & Budd P.C. ("Baron & Budd"); O'Connell & Soifer L.L.P. ("O'Connell & Soifer"); and Susman Godfrey L.L.P. ("Susman Godfrey").   Relator's two lead attorneys, Patrick O'Connell ("O'Connell") and Jan Soifer ("Soifer") were partners at Baron & Budd from the beginning of this action until October of 2010 when they formed the O'Connell & Soifer law firm.   The invoices for attorneys' fees and expenses sought by Baron & Budd and by O'Connell & Soifer are submitted jointly at Exhibit 1 to Relator's amended motion for fees.[38]  The joint submission from Baron & Budd and O'Connell & Soifer seeks fees in the amount of $1,903,650.00, and expenses in the amount of $48,031.56.[39]   The invoices for attorneys' fees and expenses sought by Susman Godfrey are submitted at Exhibit 6 to Relator's amended motion for fees.[40]   The Susman Godfrey submission seeks fees in the amount of $75,875.00, and expenses in the amount of $462.93.[41]  Thus, Relator seeks attorneys'

---

[38]Attorneys' Fee Invoices of Baron & Budd and O'Connell & Soifer, Exhibit 1 to Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109-2.  See also O'Connell Declaration, Exhibit 2, Docket Entry No. 109-3, ¶ 28; Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 35.

[39]Id.

[40]Susman Godfrey Hours Billed on US Ex Rel. Cook-Reska v. CHS et al., Exhibit 6 to Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109-7.

[41]Id.  See also Declaration of J. Hoke Peacock III ("Peacock Declaration"), Exhibit 7, Docket Entry No. 109-8, ¶¶ 4 and 9; Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 35.

fees in the amount of $1,979,525.00, and expenses in the amount of $48,494.49 for a total of $2,028,019.49.[42]

1.   Baron & Budd and O'Connell & Soifer

(a)   Hours Reasonably Expended

(1)   **Hours Attributed to Non-ED Claims**

Relator asserts that

> [a]fter reviewing approximately 2240 time entries in this matter, counsel for Relator has concluded that 315 entries, totaling 1024 hours, relate solely to the Non-ED claims (not including the 271.5 hours for which no charge is shown on the invoices, and another 20 hours for which charges are listed on Doc. 96-1), and 982 entries, totaling 2144 hours, relate to both Non-ED and ED claims, but would be required to pursue the Non-ED claims alone, and respectfully seeks reimbursement for these 3168 hours in this Amended Motion. *See* **Exhibit 1.** Counsel for Relator has further determined that 3540.5 hours relate only to the ED claims, and Relator will pursue a claim for these fees in the Middle District of Tennessee, in accordance with the Court's Order. Doc. 106.[43]

Defendants do not dispute Relator's assertion that the Baron & Budd and O'Connell & Soifer invoices contain "315 entries totaling 1024 hours [that] relate solely to the Non-ED claims."[44] Instead, defendants argue that the number of hours expended solely on the Non-ED claims should be reduced by 35% for reconstructed records,

---

[42]Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 35.

[43]Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, pp. 11-12 (citing Exhibit 1, Attorneys' Fee Invoices of Baron & Budd and O'Connell & Soifer, Docket Entry No. 109-2).

[44]Id. at 11.

block-billing, vagueness, and lack of billing judgment. "'Block-billing' is a 'time-keeping method by which each lawyer and legal assistant enters total daily time spent working on a case, rather than itemizing the time expended on specific tasks." <u>Glass v. United States</u>, 335 F. Supp. 2d 736, 739 (N.D. Tex. 2004) (quoting <u>Harolds Stores, Inc. v. Dillard Department Stores, Inc.</u>, 82 F.3d 1533, 1534 n.15 (10th Cir. 1996)).

> Courts disfavor the practice of block billing because it impairs the required reasonableness evaluation. When time records are block billed, the court cannot accurately determine the number of hours spent on any particular task, and the court is thus hindered in determining whether the hours billed are reasonable.

<u>Jane Roe/Rachel V. Rose v. BCE Technology Corp.</u>, Civil Action No. 4:12-CV-1621, 2014 WL 1322979, *6 (S.D. Tex. March 28, 2014). "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." <u>Id.</u> at *3 (citing <u>Louisiana Power</u>, 50 F.3d at 324-25). Asserting that "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation,"[45] Relator argues that the Baron & Budd and O'Connell & Soifer invoices are sufficiently detailed to allow the court to make such judgments.[46]

---

[45]<u>Id.</u> at 14.

[46]<u>Id.</u> at 15.

In response to defendants' contention that the invoices show the attorneys engaged in unacceptable block billing, Relator argues that the task descriptions do not describe more than one task but, instead, describe subparts of one task. Relator explains that

> in the course of the review project required to divide entries between "Non-ED," "ED," and "Both," counsel reviewed many of Soifer's 1026 pages of contemporaneous notes and over 7500 saved emails. In the course of doing so, in order to assist the Court and possibly forestall any further argument over the issues of potential vagueness, block billing, or billing judgment, where appropriate, counsel amended many of the time entries to more explicitly describe the tasks and to accurately reflect Soifer's contemporaneous notes and emails.[47]

---

[47]Id. (citing Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 17 ("In the course of this project, where we could, we used the contemporaneous notes and emails to revise the time entries to clarify the work being done, as the case law suggests the use of contemporaneous time records to do so is appropriate. To the extent that there are any complaints about any billing entries not being sufficiently specific, much of the detail can be filled in by reviewing the notes and/or emails from that day, but of course the case law suggests that the entries not be exhaustive. In some cases, I discovered dozens of emails exchanged on a particular day, and I sometimes noted that in the description. In many cases, we discovered that the block billing about which Defendants complained was really work on one task or project, with several specified subparts. For example, whin I was drafting a pleading, I often sent short emails to our client, consultants or co-counsel to ask about something, or to send a draft of the pleading to get feedback. Rather than simply recording hours for drafting the pleading, I recorded that I also exchanged emails about it or had a conversation about it. The additional billing information is simply detail and these entries cannot fairly be described as block billing. For the most part, many of those types of emails or calls would not take as much as five minutes, and I would not have recorded any time for such a task if it had been my only work on the case that day.").

-25-

Relator also states that her counsel has exercised billing judgment and is only claiming productive, necessary hours in pursuit of her Non-ED Claims.  Relator argues that her counsel

> reviewed each of the more than 2200 time entries, they marked as "No Charge" and removed the fees from any entries that included clerical or administrative tasks that did not require the timekeeper's professional skills or that seemed questionable in any way.  This process resulted in 257.75 "No Charge" hours for the Non-ED and Both categories, with a total dollar value of $148,350.00.  This number does not include the previously written off billings of 20 hours for $13,112.50 and 2.25 hours for $562.50 shown in Doc. 96-1, pp. 8-9, 13, which entries and amounts were removed from the invoices prior to the process described herein.[48]

Asserting that "[w]rite-offs do not need to be extensive in order to evidence billing judgment,"[49] Relator argues that "[a]n important consideration . . . is whether the hours claimed yield a fee that is excessive compared to the amount at stake. . ."[50]

Defendants argue that Soifer's admission that while reviewing her time entries to segregate her hours between the ED and the Non-ED claims she amended many of her time entries to better describe the tasks performed shows that the number of hours expended should be discounted because Soifer failed to maintain contemporaneous time records and instead reconstructed the records at a later date. The court is not persuaded by this argument.  Eleven individuals

---

[48]Id. at 16-17.

[49]Id. at 17.

[50]Id.

-26-

appear in the Baron & Budd and O'Connell & Soifer time records,[51] but defendants complain that only one of them — Jan Soifer — amended her task descriptions after the fact.  Nor do defendants dispute Soifer's declaration that the amendments made to her task descriptions were based on her contemporaneously maintained notes and emails.  The court has reviewed all of the billing entries in the Baron & Budd and O'Connell & Soifer time records attributed to Non-ED claims and is persuaded that all of the hours so attributed are reasonable, and that no reduction in hours expressly attributed to Non-ED claims in the Baron & Budd and O'Connell & Soifer time records is warranted for reconstructed records, block-billing, vagueness, or lack of billing judgment.

### (2)   Hours Attributed to "Both" Non-ED Claims and National ED Claims

Relator argues that she

> has made every possible effort to comply with the Court's Order and submit time and expenses for work "related solely to" the Non-ED claims.  However, 2144 hours have proved impossible to divide between work performed for Relator's Non-ED claims and work done on her ED claims, in large part because the work advanced both claims and was necessary to both claims. . . . These time entries are for work that was inextricably related to *both* claims, such as time spent developing the case, meeting with the client, and meeting with AUSA Bobb and other government lawyers regarding *all* of Relator's claims, and counsel

---

[51]Relator's billing records contain entries for work performed and billed by the following attorneys: Jan Soifer, Patrick O'Connell, Laura Baughman, Thomas Sims, Maya Guerra Gamble, Jim Haley, Sharon Bautista, Andrea Rose, Kim James, Sylvia Vela, and Nanci R. Wilson.

for Relator did not apportion time per minute spent
discussing each particular claim.   At the time these
tasks were performed and hours logged, Relator had no
expectation that she would have to segregate the hours
her counsel spent working on each separate claim.
Relator did not anticipate how the U.S. and Defendants
would ultimately settle her asserted claims or in what
manner the U.S. would apportion its relators' shares.[52]

Citing Longhi, 575 F.3d at 475-76, Relator argues that she is
entitled to reimbursement for all hours inextricably related to
both sets of claims as part of her Non-ED fee petition.[53]   Relator
argues that this case is analogous to Longhi because there the
Fifth Circuit affirmed a full attorneys' fees award even though the
United States successfully settled only four of twenty-one alleged
claims against the defendants.   The Fifth Circuit explained that
the settled claims arose from the same set of contracts, involved
the same actors, and the same illegal intent to defraud the
United States of money in violation of the FCA as did the claims
that the United States did not settle with defendants.   Asserting
that "[t]he same principles are at work here as in Longhi,"[54]
Relator argues that her

Non-ED claims and ED claims both include claims for
admission fraud against the same corporate defendants and
concern the same underlying factual basis with the same
"illegal intent to defraud the U.S. of money in violation
of the FCA." . . . If anything, there is even greater

---

[52]Relator's Amended Motion for Fees, Costs, and Expenses,
Docket Entry No. 109, p. 12.

[53]Id.

[54]Id.

> support for an award of all fees and expenses for the
> intertwined work on both Non-ED claims and ED claims
> because unlike the Relator in *Longhi*, Relator Cook-Reska
> *was successful on both her Non-ED and ED claims,* both of
> which the U.S. settled with Defendants and Relator was
> required to release. . . The "significance of the overall
> relief" Relator obtained — complete success in settling
> with Defendants and obtaining a relator's share on all
> Non-ED claims settled — in relation to the hours she
> "reasonably expended" on the litigation for nearly six
> years (including Non-ED and Both, totaling 3168 hours)
> unequivocally supports awarding Relator her requested
> fees under Fifth Circuit law.[55]

Alternatively, Relator argues that the court should split the

"both" fees in half, awarding half of the "both" fees in this

action and transferring the other half of the "both" fees to the

Middle District of Tennessee for adjudication in relation to the

national ED claim.[56]

Defendants argue that Relator is not entitled to reimbursement

for the hours attributed to both Non-ED and ED claims in the

Baron & Budd and O'Connell & Soifer time records because numerous

hours attributed to the "both" category relate only to the national

ED claim and because any inability to apportion the "both" time

entries is Relator's own fault.[57]  Defendants argue that

> [a] review of the Amended Petition's time entries reveals
> that Relator's "both" category includes hundreds of hours
> spent on communications and conferences with counsel for
> other relators, including O&S's co-counsel on the Nancy

---

[55]*Id.* at 13-14.

[56]Relator's Reply, Docket Entry No. 120, p. 5.

[57]Defendants' Memorandum in Opposition, Docket Entry No. 118,
pp. 10-13.

Reuille representation. Critically, however, *Cook-Reska was the only relator to allege the Laredo claim, and O&S was the only law firm to represent her*. The hundreds of hours that the O&S attorneys spent conferring with co-counsel on the *Reuille qui tam* case, as well as attending calls with other relators' counsel, was the direct result of their involvement in the national ED investigation that is no longer before this Court. This time cannot be said to "relate[] solely" to the Laredo claim, nor even to "both" claims.

Similarly, other entries in the "both" category reflect work on inter-relator agreements. The O&S attorneys spent a significant amount of time in 2011 negotiating joint representation and sharing agreements with counsel for other relators. Again, because no other relator made allegations relating to the Laredo claim, these negotiations with other relators necessarily had no connection to the Laredo claim and involved only the national ED claim. (Moreover, Relator should never have included these hours in her fee petition in any event; as a matter of law, a relator is not entitled to recover fees from a defendant for fee sharing negotiations and other infighting among relators and the Government.)[58]

The court agrees.

The court directed Relator to file an amended motion for fees "related solely to claims based on allegations that [LMC] billed government programs for medically unnecessary inpatient procedures and engaged in improper financial relationships."[59] Yet, the vast majority of the entries in the Baron & Budd and the O'Connell & Soifer time records accompanying Relator's amended motion for fees, i.e., 982 entries, totaling 2144 hours is attributed to a category

---

[58]*Id.* at 10-11 (citing U.S. ex rel. Becker v. Tools & Metals, Inc., Civil Action Nos. 3:05-CV-067-L and 3:05-CV-2301-L, 2013 WL 1293818, at *16 (N.D. Tex. 2013) (affirming Magistrate Judge's denial of award of fees for relator sharing agreement and responding to second filer's motions).

[59]Memorandum Opinion and Order, Docket Entry No. 106, p. 21.

labeled "both."[60]   Relator argues that she is unable to divide the
"both" time entries between time spent on the Non-ED claim and the
national ED claim.   But as defendants have pointed out, a review of
the Baron & Budd and O'Connell & Soifer time records shows that
time entries attributed to the "both" category include many hours
spent negotiating inter-relator agreements and hundreds of hours
spent on communications and conferences with counsel for other
relators.   Because the Relator in this action was the only relator
to allege claims against LMC, and because Relator was only
represented by attorneys at the Baron & Budd and O'Connell & Soifer
law firms, hours spent negotiating inter-relator agreements and
conferring with co-counsel cannot reasonably be related solely to
the LMC Non-ED claim.   The court's review of the Baron & Budd and
O'Connell & Soifer invoices shows that the shift in direction away
from the Non-ED claims related solely to LMC to the national ED
claim occurred in early 2011 when — as Relator acknowledges — the
United States not only informed her counsel of similar cases filed
in other jurisdictions, but also began a nationwide investigation
and encouraged Relator to work together with relators in other
cases and share any proceeds that might result.   Relator states:

---

[60]See Relator's Amended Motion for Fees, Costs, and Expenses,
Docket Entry No. 109, p. 12 (". . . 982 entries, totaling 2144
hours, relate both to Non-ED and ED claims, but would be required
to pursue the Non-ED claims alone. . .").   See also Attorneys' Fee
Invoices of Baron & Budd and O'Connell & Soifer, Exhibit 1 to
Relator's Amended Motion for Fees, Costs, and Expenses, Docket
Entry No. 109-2).

In early 2011, while Relator was continuing to work with AUSA Bobb on this case, the U.S. reported to Relator that there were three other *qui tam* suits filed against one or more of the Defendants which were similar to Relator's *qui tam* suit.  Soifer Dec., Ex. 3 ¶ 30.  After seeing the similarity of some of the allegations in these four cases, the U.S. began a nationwide investigation, which it focused on the overlapping claims among the first four cases (specifically, false claims in Emergency Department admissions by Defendants), and asked the first four relators to assist it with its investigation and analysis of the Defendants' conduct.  *Id.*  The U.S. encouraged the first four relators to reach an agreement to work together on the cases and share any proceeds that might result, in order to allow them to work effectively and efficiently as a unit on behalf of the U.S. and themselves.  *Id.*  The first four relators reached such an agreement in early April 2011.  In April and May 2011, the U.S. began to assign duties to counsel for each of the first four relators as well as counsel for relators in a seventh *qui tam* case (filed in the Middle District of Tennessee on May 10, 2011).  *Id.*  These assignments included reviewing, analyzing, coding, and summarizing over 400,000 documents — including almost two million page images and over 76,000 native files — Defendants produced pursuant to U.S. subpoenas based on the claims in the first four cases, as well as the over 680,000 images of LMC documents produced to AUSA Bobb.  Id. ¶¶ 29, 32-33.

After May 2011, most of the time entries for Relator's counsel involved the work assigned by the U.S. Department of Justice in reviewing the database related to ED claim subpoenas to Defendants.  *Id.* ¶ 32.  As a general rule, all of those entries have been segregated and will be included in Relator's Motion for Award of Fees for ED Claims in Nashville.  However, Relator's counsel continued to work with DOJ on all aspects of Relator's case, including work on the probe audit related primarily to "Medically Unnecessary Inpatient Procedures," and the completion of the review of LMC documents, which related primarily to "Improper Financial Relationship" (also known as Stark and Anti-Kickback Statute or AKS claims, all of which is considered work on the Non-ED Claims), and the investigation and negotiation of settlement of these Non-ED Claims.  *Id.*  Relator and her counsel also continued to work as part of DOJ's team, which scheduled regular conference calls of the combined team to discuss the progress on all of the claims in the litigation.  *Id.*

Although most of the counsel for relators in the multiple *qui tam* cases were working solely on the ED claims, Relator's counsel continued to work on both ED and Non-ED claims, and until this Court severed the motion for fees between the two sets of claims on which Relator was successful, her counsel did not attempt to bill time to one set of claims rather than the other. *Id.* ¶ 12.[61]

Review of the Baron & Budd and O'Connell & Soifer invoices leads the court to conclude that from the time the claims in this action began to be investigated in October of 2008, until early 2011 when the United States initiated a nationwide investigation focused on false claims in Emergency Department admissions by Defendants, all of the Baron & Budd and O'Connell & Soifer time entries reasonably related to the Non-ED claims or to tasks necessarily required to advance those claims. Beginning on March 9, 2011, however, Relator's attorneys began to spend the lion's share of the time expended on this case working on matters related to the national ED-claim. On March 9, 2011, O'Connell, Soifer, and their paralegal, Sylvia Vela all billed time attributed to receiving, reviewing, and discussing information regarding other lawsuits pending against defendants. These billing time records also show that on March 10, 2011, the O'Connell & Soifer legal team began working on sharing agreements with other relators. Because Relator has acknowledged that the similarity in these cases concerned the defendants' Emergency Department admissions, and that the national investigation focused on Emergency Department

---

[61]See Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, pp. 5-6.

admissions, the court is not persuaded that from March 9, 2011, onward, Relator's counsel could not reasonably have segregated their time between their work on the non-ED claims related solely to LMC, and work on the national ED claims. See Von Clark v. Butler, 916 F.2d 255, 259 (5th Cir. 1990) (recognizing that "[p]art of an applicant's ability to meet his burden [of proving the reasonableness of the number of hours claimed] includes maintaining billing time records in a manner that would enable the reviewing court to identify each distinct claim"). Accordingly, the court concludes that the hours in the Baron & Budd and O'Connell & Soifer time records attributed to "both" the non-ED claims and the national ED claims from October 27, 2008, through March 8, 2011, are compensable as reasonably having been expended litigating the non-ED claims, but that the hours attributed to "both" the non-ED claims and the national ED claims from March 9, 2011, through the present are not compensable as having reasonably been expended litigating the non-ED claims.

### (3) Reduction of Hours for Attorney Travel Time

Relator seeks attorneys' fees for time that Baron & Budd and O'Connell & Soifer attorneys spent traveling; i.e., Relator seeks attorneys' fees for 97 hours of travel time at a value of $68,250.[62] Relator argues that the request for 97 hours of attorneys' fees for

---

[62]Id. at 17-18 (citing Soifer Declaration, Docket Entry No. 109-4, ¶ 22).

time that her counsel spent traveling is reasonable because Soifer

states:

> I also note that Defendants have previously complained
> about our travel time, but used an incorrect estimate of
> our time billed during traveling. The actual numbers are
> 97 hours out of a total of 3168 hours, with a value of
> $68,250, and most of those hours we worked on the Non-ED
> claims while we were traveling.   Moreover, we were not
> traveling for fun; we were required to travel to work on
> the case, and the time spent traveling when we were
> unable to work was time when we could not bill to other
> matters, either.   Most of our travel time was for the
> many trips we took to Houston to review LMC Non-ED
> documents in the U.S. Attorney's office in August -
> November 2010.   We would have preferred to review these
> documents in our office and avoid the travel time
> (although we stayed at my mother's home and did not bill
> for a hotel), but Mr. Bobb was unwilling to allow us to
> have access to the documents outside of his office until
> much later in the case, when the other database was set
> up online.   We request that we be paid in full for these
> hours.[63]

Despite Soifer's statement to the contrary, the court's review of

the Baron & Budd and O'Connell & Soifer invoices leads the court to

conclude that the hours Relator's counsel spent traveling (mostly

between Austin and Houston) were not hours that counsel also spent

working on Relator's claims.   While the descriptions of the tasks

performed on travel days often show that counsel worked on

Relator's claims once they arrived at their destinations, few of

these descriptions reference any work on Relator's claims performed

during the time of travel.[64]   One of the only references to work

---

[63]Soifer Declaration, Docket Entry No. 109-4, ¶ 22.

[64]See Attorneys' Fee Invoices of Baron & Budd and O'Connell &
Soifer, Exhibit 1 to Relator's Amended Motion for Fees, Costs, and
(continued...)

performed during a trip states "phone calls from car regarding status of document review project and strategy for partial unsealing,"[65] without stating to whom the phone calls were made or how long the phone calls lasted. Another is only a vague reference by Soifer to having discussed strategy with O'Connell in the car during the trip,[66] without stating how long the discussion lasted. Because neither the Baron & Budd nor the O'Connell & Soifer time records provide much if any evidence that work was done during the time that Relator's attorneys traveled, and because Relator has not presented any evidence that comparably skilled practitioners charge their full hourly rate for travel time, the court concludes that the number of hours counsel has billed for traveling should be reduced by half. See Watkins v. Fordice, 7 F.3d 453, 458-59 (5th Cir. 1993) (holding that the district court did not abuse its discretion by reducing the hourly rate billed by 50% for travel time); In re Babcock & Wilcox Co., 526 F.3d 824, 828 (5th Cir. 2008) (per curiam) (noting that generally "it is not an abuse of discretion to discount non-working (and even working) travel time"); Preston Exploration Co., LP v. GSP, LLC, Civil Action

---

[64](...continued)
Expenses, Docket Entry No. 109-2 (entries for May 15 and May 17, 2009; June 7 and June 9, 2009; August 17 and August 20, 2010; September 4 and September 9, 2010; September 12, 2010; September 20, 2010; October 4, 2010; October 19, 2010; November 2 and November 4, 2010).

[65]See id. (Soifer entry for August 20, 2010).

[66]See id. (Soifer entry for September 4, 2010).

No. H-08-3341, 2013 WL 3229678, *7 (S.D. Tex. June 25, 2013)
("Courts in the Fifth Circuit often reduce compensable hours for
travel."); American Zurich Ins. Co. v. Jasso, ____ Fed. App'x ___,
2015 WL 151668, *9 (5th Cir. January 13, 2015) (per curiam)
(affirming district court's reduction of "the fees requested for
time spent traveling to 17.5 hours at the hourly rate of $288, as
opposed to the requested 35 hours at $375 per hour").

### (4)  No Reduction for Litigating Fee Award

Relator asserts that her

> [c]ounsel has spent 130 hours, without charge, reviewing
> and analyzing each of 2240 billing and 282 expense
> entries, and where necessary to determine precisely which
> claim was bing addressed in a given entry, reviewing many
> of Soifer's 1026 pages of notes made contemporaneously by
> her during meetings, discussions, and phone calls, as
> well as reviewing many of Soifer's over 7500 emails
> related to this case, which she saved in case-related
> email folders, to determine whether each entry was
> "related solely" to Non-ED claims. . . This has been a
> challenging task because much of the work was not
> performed on one claim at a time.[67]

Asserting that "Relator seeks $419,737.00 in fees for 628.75
hours of work performed *after* execution of the CHSI settlement and
dismissal of Relator's lawsuit,"[68] defendants argue that the number
of hours billed for seeking fees, expenses, and costs is
unreasonable because litigation of the fee request has consisted of

---

[67]Relator's Amended Motion for Fees, Costs, and Expenses,
Docket Entry No. 109, p. 11.

[68]Defendants' Memorandum in Opposition, Docket Entry No. 118,
p. 6.

only three motions that did not require discovery or hearings, that largely concerned the national ED claim, and arguments that Relator lost.[69]  Defendants also argue that Relator's fees-on-fees request is inflated because the highest-billing attorneys charged for almost all of the time:

> Of the 471.25 hours billed by O&S to the fee dispute, 338.25 hours (72%) were billed by Patrick O'Connell and Jan Soifer at $800 per hour.  Another 111.75 hours (24%) were billed by Jim Haley at $600 per hour.  *Not a single associate hour was billed*.  Nor was a single partner hour discounted to an associate billing rate, notwithstanding how much time was spent on associate-level tasks such as legal research and the initial drafting of briefs and affidavits.[70]

Defendants contend that "[m]uch of this fees-on-fees litigation could have been averted entirely if Relator's counsel had exercised billing judgment, maintained better time records, and kept track of the hours worked on each distinct claim."[71]  Quoting Coulter v. State of Tennessee, 805 F.2d 146, 151 (6th Cir. 1986), defendants argue that "[a]s a general matter, 'the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial.'"[72]

Relator may recover reasonable attorneys' fees for time spent litigating a fee request.  See Fontenot v. Louisiana Board of

---

[69]Id. at 6-7.

[70]Id. at 8.

[71]Id.

[72]Id. at 9.

Elementary and Secondary Education, 835 F.3d 117, 121 (5th Cir. 1988) (citing Cruz v. Hauck, 762 F.2d 1230, 1233 (5th Cir. 1985) ("It is settled that a prevailing plaintiff is entitled to attorney's fees for the effort entailed in litigating a fee claim and securing compensation.")). Hensley, 103 S. Ct. at 1941,

> requires the district court to consider the relationship between the amount of the fee awarded and the results obtained, fees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation. For example, if the Government's challenge to a requested rate for paralegal time resulted in the court's recalculating and reducing the award for paralegal time from the requested amount, then the applicant should not receive fees for the time spent defending the higher rate.

Commissioner, I.N.S. v. Jean, 110 S. Ct. 2316, 2321 n.10 (1990 (citing Hensley, 103 S. Ct. at 1941). Defendants' concern that Relator's request for attorneys' fees incurred litigating the fee request is excessive has been taken into consideration and accounted for in the court's conclusion that Relator should be awarded all of the attorneys' fees reasonably attributed to litigation of the Non-ED claims and all of the hours attributed to litigation of both the Non-ED and the ED claims before March 9, 2011, but that Relator should not be awarded attorneys' fees for any of the hours attributed to litigation of both the Non-ED and ED claims from March 9, 2011, to the present. As explained in § III.B.1(a)(2), above, beginning on March 9, 2011, Relator's billing records reflect that the lion's share of counsel's time shifted away from the Non-ED claims and to the national ED claim,

the negotiation of sharing agreements with relators in other cases, and the United States' national investigation.  Beginning on March 9, 2011, Relator's counsel could and should have been aware of the need to segregate their time between claims arising from the fraudulent ED admissions that were being investigated on a national level, and claims arising from fraudulent practices that were being investigated only at LMC.  The court concludes that the results the Relator obtained on the Non-ED claims justifies a fee award for litigating and settling those claims.  Because defendants have not cited and the court has not found any Fifth Circuit case that has relied on <u>Coulter</u>, 805 F.2d at 151, to cap a fee award allowed for preparing and litigating attorneys' fees to 3% of an award in a main case when the case ends without a trial, the court is not persuaded that such limitation is warranted here.

     (b)   Reasonable Hourly Rates

Relator's records from Baron & Budd and O'Connell & Soifer contain entries for work performed by eight attorneys, two paralegals, and one fraud investigator at the following rates:

| Timekeeper | Position | Years of Experience | 2014 Hourly Rate |
|---|---|---|---|
| Jan Soifer | Attorney | 32 | $800 |
| Patrick J. O'Connell | Attorney | 29 | $800 |
| Laura Baughman | Attorney | 20 | $800 |
| Thomas Sims | Attorney | 15 | $700 |
| Maya Gamble | Attorney | 17 | $600 |

| Timekeeper | Position | Years of Experience | 2014 Hourly Rate |
|---|---|---|---|
| Jim Haley | Attorney | ? | $600 |
| Sharon Bautista | Attorney | 9 | $500 |
| Andrea Rose | Attorney | 8 | $500 |
| Sylvia Vela | Paralegal | 25 | $250 |
| Kim James | Paralegal | ? | $250 |
| Nanci R. Wilson | Investigator | 22 | $250 |

In support of these hourly rates Relator submits declarations from O'Connell,[73] Soifer,[74] Joel M. Androphy,[75] and Mark Alan Kleiman.[76] Relator argues that

> [t]he attached Declarations of attorneys O'Connell and Soifer (Exs. 2 and 3) provide ample evidence that the hourly rates incurred by Relator's attorneys ($800 for partners with over 30 years of experience like attorneys O'Connell and Soifer; $500-700 for experienced lawyers, $250 for an experienced fraud investigator, and $250 for paralegals) are entirely reasonable. Relator also submits the Declarations of Joel Androphy and Mark Kleiman, **Exhibits 4 and 5**, respectively, in support of the reasonableness of her counsel's rates. Both declarants are experienced *qui tam* litigators, and both opine that the hourly rates charged by Baron & Budd and O'Connell & Soifer are reasonable and within prevailing market rates in a national *qui tam* case such as this one.[77]

---

[73]O'Connell Declaration, Exhibit 2, Docket Entry No. 109-3.

[74]Soifer Declaration, Exhibit 3, Docket Entry No. 109-4.

[75]Declaration of Joel M. Androphy ("Androphy Declaration"), Exhibit 4, Docket Entry No. 109-5.

[76]Declaration of Mark Allen Kleiman ("Kleiman Declaration"), Exhibit 5, Docket Entry No. 109-6.

[77]Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, p. 19.

O'Connell states in his declaration that he has been licensed to practice law in the State of Texas since May 1985, that he has been a partner with the firm of O'Connell & Soifer since October of 2010, and that since 2008 he has shared lead counsel responsibilities for this lawsuit with Jan Soifer. He also states that the law firm of O'Connell and Soifer generally limits its practice to representation of whistleblowers in False Claims Act cases. He states that representation of parties in these types of cases is a specialized, high-risk contingency practice that requires large amounts of time and resources. Based on his experience and the prevailing hourly market rate of attorneys with similar experience in Austin, Texas, where he practices, and in Houston, Texas, where this case was filed, O'Connell states that the hourly rate of $800.00 charged by him and his partner, is reasonable.[78] O'Connell explains that

> [w]hile I do not generally do hourly rate work, I was hired in 2012 by a qui tam attorney to consult with him on a contentious multi-million dispute with his client which included claims of malpractice. Like this case, the engagement in this matter involved multiple relators and multiple claims. The engagement required extensive experience and knowledge of qui tam litigation. I charged and was paid $800 per hour for that work.[79]

Soifer states in her declaration that she has been licensed to practice law in the State of Texas since 1982, has been a partner

---

[78]O'Connell Declaration, Exhibit 2, Docket Entry No. 109-3, ¶ 13.

[79]Id. ¶ 12.

with the firm of O'Connell & Soifer since October of 2010, and before that was Special Counsel at the firm of Baron & Budd, and a partner at the Austin office of the Liddle, Sapp firm, which became Locke Liddle & Sapp, and is now known as Locke Lord.  She states that for almost a decade she has focused her practice on representing whistleblowers in <u>qui tam</u> litigation under the federal False Claims Act and its state counterparts.  Based on her experience and the prevailing hourly market rate of attorneys with similar experience in Austin, Texas, where she practices, and in Houston, Texas, where this case was filed, Soifer states that the hourly rate of $800.00 charged by her and her partner, Patrick O'Connell is reasonable.[80]  Soifer explains that

> I was a litigation partner at the firm now known as Locke Lord LLP from 1997 - 2004.  My $800 hourly rate in this case is comparable if not identical to what I would be charging if I had remained at that firm.  In reaching this conclusion, I contacted Locke Lord and learned that the Austin litigation partner with the most comparable experience to mine, John Schwartz, charges and is paid $800 an hour.  And several litigation partners at Locke Lord's Houston office with equal or less experience than I have are billing and being paid more than $700 an hour, including litigation partners John Hall ($730), Greg Burch ($765), and Kenneth McKay ($765), all for clients who pay their invoices monthly, regardless of the outcome of their cases.  None of those lawyers have developed an expertise in *qui tam* FCA practice as I have during the decade since I left that firm.[81]

Androphy states in his declaration that the hourly rates reflected on the Baron & Budd and O'Connell & Soifer invoices are

_____

[80]Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 25.

[81]<u>Id.</u> ¶ 23.

reasonable and customary for Harris County, Texas, and the national FCA community for complex litigation.[82]   Kleiman states in his declaration that he is an experienced attorney in California who like O'Connell and Soifer represents whistleblowers in FCA cases, that he has known O'Connell and Soifer for years, and that in his opinion both the number of hours expended and the hourly rates sought here are reasonable and necessary to obtain the result achieved.   Kleiman also states that he has prosecuted and settled qui tam cases, receiving between 85% and 100% of his hourly fees without challenge in several districts across the country, and that in the last three years he has charged and received fees between $700 and $750 per hour.[83]

Defendants argue that the rates Relator seeks for O'Connell and Soifer are excessive, not reasonable, regardless of whether they are measured against rates paid in the Houston community or in the national FCA community.[84]   As evidence of market rates in the Houston area, defendants cite Jane Roe/Rachel V. Rose v. BCE Technology Corp., Civil Action No. 4:12-CV-1621, 2014 WL 1322979, *3 (S.D. Tex. March 28, 2014), in which Judge Harmon stated that "[c]ourts in and around Houston have found hourly rates between $200 and $600 to be reasonable after considering the experience of

---

[82]Androphy Declaration, Exhibit 4, Docket Entry No. 109-5, ¶ 8.

[83]Kleiman Declaration, Exhibit 5, Docket Entry No. 109-6, ¶¶ 6-11.

[84]Defendants' Memorandum in Opposition, Docket Entry No. 118, pp. 18-24.

the lawyer, the reputation of the firm, and the complexity of the case."  Defendants also cite <u>Preston</u>, 2013 WL 3229678, at *5, in which Judge Miller observed that the "most expensive hourly rate" of $600 per hour was reasonable for a partner of 38 years' experience with an outstanding reputation for trying complex cases. Defendants also cite national <u>qui tam</u> cases in which courts have recently approved hourly rates for experienced attorneys ranging from $375 to $600.[85]  Defendants contend that

> Relator's attorneys should be compensated at rates within
> the same range of $200 to $600 per hour that courts in
> this district have awarded in recent <u>qui tam</u> actions. . .
> A discount of 30% to [O'Connell & Soifer's] proposed
> rates would bring them into this normal range, would also
> account for the fact that many of the tasks performed
> were not partner-level tasks, and would still compensate
> Mr. O'Connell and Ms. Soifer each at $560 per hour.[86]

Defendants also object to the $250 per hour rate sought for paralegal Sylvia Vela.[87]

---

[85]<u>Id.</u> at 20 (citing <u>United States ex rel. Rigsby v. State Farm Fire & Casualty Co.</u>, 2014 WL 691500, at *14 (S.D. Miss. 2014) (rejecting requested rate of $505 and approving $400 per hour for partner with 20 years' experience); <u>United States ex rel. Singh v. Bradford Regional Medical Center</u>, 2013 WL 5467107, at *4 (W.D. Pa. 2013) (approving $475 for senior attorney with significant <u>qui tam</u> experience in health care fraud case); <u>United States ex rel. Liotine v. CDW-Government, Inc.</u>, 2013 WL 5366960, at *2-*3 (S.D. Ill. 2013) (approving $550-$600 for lead partners with FCA experience); <u>United States ex rel. Rille v. Hewlett Packard Co.</u>, 2011 WL 4625646, at *4 (E.D. Ark. 2011) (finding $375 per hour — not $650 per hour — appropriate for "top-notch" counsel who are "specialists in FCA cases" and achieved a large settlement amount).

[86]<u>Id.</u> at 23-24.

[87]<u>Id.</u> at 23 n.22.

Relator has not offered evidence that any <u>qui tam</u> lawyer has ever been awarded $800 per hour in Houston or elsewhere in the country.   Nor has Relator offered any local market evidence supporting the rates sought for attorneys other than O'Connell and Soifer, or for their paralegals.   Based on cases cited by defendants and on the court's own knowledge of market rates in the Houston, Texas, market, the court will therefore limit the rates of Relator's attorneys and paralegals as follows:   the rate for Mr. O'Connell and Ms. Soifer will be $550 per hour; the rate for other attorneys with five or more years of experience will be $300 per hour; the rate for attorneys with less than five years experience will be $200 per hour; and the rate for paralegals and investigators will be $125 per hour.[88]

(c)   No Adjustment Required by the <u>Johnson</u> Factors

Neither party asks the court to adjust the lodestar rate up or down due to any of the twelve factors identified in <u>Johnson</u>, 488 F.2d at 717-19.[89]   Nevertheless, the first and third <u>Johnson</u> factors

---

[88]<u>See</u>, <u>e.g.</u>, Jeanne Graham, Texas Lawyer's Annual Salary & Billing Report, <u>Texas Lawyer</u>, Vol. 30 No. 18 (July 28, 2014), pp. 1, 19-22 (identifying 2014 median average billing rates as: $375 for equity partners at Houston firms; $475 for equity partners at firms with over 100 lawyers, and as $375 for equity partners at firms with fewer than 30 lawyers; $304 for seventh-year associate; $240 for fourth-year associates at Houston firms; and as $119 for a senior legal assistant).

[89]<u>See</u> Defendants' Memorandum in Opposition, Docket Entry No. 118, p. 24 ("Most of the applicable *Johnson* factors are subsumed within Defendants' proposed lodestar calculation. . . (continued...)

— "time and labor required for the litigation" and "skill required to perform the legal services" merit consideration.  This case was initiated in 2008 and settled in 2014.  For six years Relator and her counsel worked with the United States Attorney's office to investigate the underlying facts and prosecute her claims.  In Perdue the Supreme Court recognized that the delay in receiving fees in a federal fee-shifting statute case can justify awarding attorneys' fees using the attorneys' current rates rather than the rates at the time the services were rendered.  Perdue, 130 S. Ct. at 1675.  This case was never tried, and much of the work done by Relator's attorneys was investigative in nature.  The Fifth Circuit has recognized that the reasonableness of the time expended and its worth is governed by Johnson's instruction that

> [i]t is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such nonlegal work may command a lesser rate.  Its dollar value is not enhanced just because a lawyer does it.

Abrams v. Baylor College of Medicine, 805 F.2d 528, 535 (5th Cir. 1986) (quoting Johnson, 488 F.2d at 717).  Consideration of these two Johnson factors leads the court to conclude that the

---

[89] (...continued)
Defendants do not request an additional downward adjustment to the lodestar based on these factors."); Relator's Amended Motion for Fees, Costs, and Expenses, Docket Entry No. 109, p. 22 ("Relator requests that the Court neither increase nor decrease the lodestar due to the application of the aforementioned [Johnson] factors. . . Relator . . . simply requests that the Court award the lodestar amount without any modifications.").

appropriate hourly rates in this case are the rates for the Houston market in 2014, the year the case settled, i.e., rates that are considerably less than the rates that Relator seeks. Since the court has already applied these considerations in determining the lodestar rate, the court concludes that no additional adjustment is required.

        (d)   Expenses

Relator's amended motion seeks $48,494.49 in costs and expenses incurred by Baron & Budd and O'Connell & Soifer. Defendants state that "Relator requested $52,469.62 in costs and expenses in her Original Petition that encompassed both claims,"[90] and that "[i]t appears the only significant costs removed from the Amended Petition were the $4,825.75 incurred in connection with a mediation among the various relators over the relator's share, for which Relator was not permitted to recover fees as a matter of law,"[91] and that "Relator appears to have made no attempt to divide her costs between the Laredo claim and the national ED claim."[92] Defendants argue that

> [a]bsent such an allocation, Relator should be permitted to recover costs for the Laredo claim in the same proportion as the United States' overall recovery, i.e., the Laredo claim was approximately 10% of the United States' $97,257,000 settlement with Defendants.

---

[90]Id. at 25.

[91]Id. at n.24.

[92]Id. at 25.

-48-

> Consequently, she should be awarded costs for the Laredo claim of no more than 10% of her total costs, or $4,849.45.[93]

Despite defendants' argument to the contrary, the list of expenses included in Exhibit 1 to Relator's Amended Motion for Fees, Costs, and Expenses, does segregate expenses between those attributed to Non-ED claims and those attributed to both Non-ED and ED claims. For essentially the same reasons stated in § III.B.1(a), above, that the court has already concluded that Relator is entitled to recover fees for all of the attorney hours attributed to the Non-ED claim and for the attorney hours attributed to both the Non-ED claim and the ED claim prior to March 9, 2011, the court concludes that Relator is entitled to recover all of the expenses attributed to the Non-ED claims and for expenses attributed to both the Non-ED and the ED claims from the inception of this suit to March 9, 2011, when the focus of the case shifted away from the Non-ED claims and to the ED claims.

### 2.   Susman Godfrey

Relator seeks fees for legal work performed by Susman Godfrey in the amount of $75,875.00 and expenses in the amount of $462.93.[94] The reasonableness and necessity of the hours expended and the rates reflected on the Susman Godfrey billing records are supported

---

[93] Id.

[94] Id.   See also Peacock Declaration, Exhibit 7, Docket Entry No. 109-8, ¶¶ 4 and 9; Soifer Declaration, Exhibit 3, Docket Entry No. 109-4, ¶ 35.

by the Declaration of Susman Godfrey attorney J. Hoke Peacock III ("Peacock") who states that "the Susman Godfrey legal team has spent 157.50 hours through November 30, 2014 working on matters that are related to non-ED claims or related to *both* ED and non-ED claims, for total fees of $75,875."[95]  Peacock also states that the time expended by the Susman Godfrey time keepers was reasonable and necessary for prosecuting Relators' motions for attorneys' fees, costs, and expenses and related motions.  Peacock explains that Susman Godfrey was engaged in this matter after Relator filed her original motion for attorneys' fees, costs, and expenses, and

> shortly after Defendants filed their Motion to Sever and Transfer Relator's Claim for Attorneys' Fees and Costs Related to Allegations of Improper Emergency Department Admissions ("Motion to Sever") (Dkt. 76).  My team at Susman Godfrey researched and drafted Relator's response and sur-reply to Defendants' Motion to Sever and worked closely with co-counsel to review and edit Relator's reply to the original Motion for Fees.  We also have had regular status conference calls with co-counsel to plan case strategy, develop legal arguments, and discuss briefing.[96]

Peacock states that his usual billing rate is $700 per hour, and that his team consisted of associate attorney Katherine Kunz whose reasonable billing rate is $425 per hour, and legal assistant Tiffany Saunders whose reasonable billing rate is $150 per hour.

The court's review of the Susman Godfrey billing records shows that the time expended in September and October of 2014 was focused

---

[95]Peacock Declaration, Exhibit 7, Docket Entry No. 109-8, ¶ 4.

[96]Id. ¶ 5.

on responding to defendants' motion to sever and transfer and supporting Relator's original motion for attorneys' fees, costs, and expenses, but that the time expended in November of 2014 was spent working on Relator's amended motion for attorneys' fees, costs, and expenses in this court. The court concludes that Relator is entitled to recover attorneys' fees, costs, and expenses incurred by Susman Godfrey from November of 2014 through the date of this Memorandum Opinion and Order because those sums are related solely to the non-ED claims; but that Relator is not entitled to recover attorneys' fees, costs, and expenses incurred by Susman Godfrey in September and October of 2014 because those sums are not related solely to the ED claims, but are primarily related to the national ED claim, and Relator has made no attempt to segregate these expenses between the two types of claims.[97]   Because defendants do not contest the reasonableness of Susman Godfrey's hourly rates, and because the court has limited the number of hours for which Relator may recover attorneys' fees incurred by Susman Godfrey, the court will not reduce the hourly rates sought for Susman Godfrey's legal work. See Louisiana Power, 50 F.3d at 328 (recognizing that where a rate is not contested, it is prima facie reasonable).

---

[97]See Defendants' Memorandum in Opposition, Docket Entry No. 118, pp. 6-7 (arguing that Relator's original motion for fees and defendants' motion to sever and transfer largely concerned the national ED claim).

## IV.   Conclusions and Orders

For the reasons stated in § II, above, Relator's Motion to Transfer Remaining Portion of Realtor's Case to the Middle District of Tennessee (Docket Entry No. 110) is **DENIED**.

For the reasons stated in § III.B.1(a) above, the court concludes that Relator is entitled to an award of attorneys' fees, costs and expenses incurred by Baron & Budd and by O'Connell & Soifer for all of the hours attributed to Non-ED claims and for all of the hours attributed to both the Non-ED and the ED claims incurred before March 9, 2011, but that the number of hours that counsel has billed for traveling should be reduced by half.   For the reasons stated in § III.B.1(b), above, the court concludes that reasonable hourly rates for the Baron & Budd and O'Connell & Soifer attorneys and paralegals are as follows:   Mr. O'Connell and Ms. Soifer — $550 per hour; attorneys with five or more years of experience — $300 per hour; attorneys with less than five years experience — $200 per hour; and paralegals and investigators — $125 per hour.   For the reasons stated in § III.B.2, above, the court concludes that Relator is entitled to an award of attorneys' fees, costs, and expenses incurred by Susman Godfrey for all of the hours and expenses billed from November of 2014 through the date of this Memorandum Opinion and Order and that the reasonable hourly rates for the Susman Godfrey attorneys are Mr. Peacock — $700 per hour, and Ms. Kunz — $425.00 per hour.

Accordingly, Relator's Amended Motion for Award of Attorneys' Fees, Costs, and Expenses, Related Solely to Her Non-ED Claims Against Defendants, Pursuant to 31 U.S.C. § 3730(d)(1) (Docket Entry No. 109) is **GRANTED IN PART and DENIED IN PART**.

The parties shall calculate the reasonable attorneys' fees, costs, and expenses allowed by the court and submit a proposed order agreed as to form by May 18, 2015.  If the parties are unable to reach an agreement, each party shall submit its own proposed order on May 18, 2015, with a statement no more than five pages in length explaining why they were unable to agree and why its proposed order more accurately reflects the court's rulings.

**SIGNED** at Houston, Texas, on this the 4th day of May, 2015.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE